# SUPREME COURT.

## FREEMAN CLARKE agt. THE CITY OF ROCHESTER.

All the inherent power of the people for self-government, not delegated to the general government, is reserved to and belongs to the state.

Of such reserved powers the entire legislative power is vested in the state legislature, subject to no restrictions or limitations, except such as are contained in the state constitution.

The *taxing* power belongs to the legislature, and is subject to no limits or restrictions outside of the United States and state constitutions.

The power to authorize the *construction of works of internal improvements*, and to provide for their construction by the officers or agents of the state, rests with, and pertains to, the legislature, to be exercised within its exclusive discretion.

Such works may be constructed by *general taxation*, and in case of *local* works by *local taxation ;* or the state may aid in their construction by *becoming a stockholder in private corporations ;* or *authorize municipal corporations to become such stockholders* for such purpose.

*Railroads are public works,* and may be constructed by the state, or by corporations, and lands taken for their use, are taken for the *public use,* and may be so taken on payment of a just compensation.

The legislature is the exclusive judge in respect to what works are for the public benefit, and in regard to the expediency of constructing such works, and as to the mode of their construction, whether by the state or by private or municipal corporations, in whole or in part.

The legislature *may authorize municipal corporations to subscribe to the stock of a railroad company,* with the consent and approval of a majority of the corporators duly ascertained.

The passage of a law authorizing such subscriptions to the stock of a private corporation, *subject to the assent or approval of the corporation ;* or to take effect upon the approval or assent of a *municipal corporation, by the vote of the corporators,* is not a *delegation of power to the corporation to pass a law,* but is a legitimate case of *conditional legislation,* and is entirely within the discretion of the legislature.

The act to amend the charter of the city of Rochester, passed July 5th, 1851, including the §§ 285 to 291 inclusive, was a *valid law immediately upon its passage and the signature of the governor thereto ;* and the provision therein that those sections should not take effect until approved by the corporation, merely suspended the power of the common council to act upon said sections until such approval.

The acts of the city of Rochester, in subscribing for the stock of the Genesee Valley Railroad Company, and in issuing the bonds of the city for such stock,

as stated in the case in this action, were legal and valid acts; and the city was entitled to take and hold such stock, or to sell it to the plaintiff as valid stock, and is bound to pay the bonds so issued; and the plaintiff was not entitled to rescind his contract for the purchase of such stock, on the ground of its invalidity. (*It will be seen that this decision reverses that of Mr. Justice* W. F. ALLEN *in the same case*, 13 *How.* 204.)

It is fatally erroneous in regarding and treating the subject of the provisions in question as a *private business,* belonging to the same class as the business of banking, and of manufacturing, and commercial associations, incorporated or unincorporated. (*Per* T. R. STRONG, *Justice.*)

Assuming the construction of the railroad to be (which it clearly is) a work of *public character,* which the city might be authorized to do, it seems to be clear, that it might equally be authorized.to assist others in doing the work. The power of the legislature over the subject being established, the expediency or propriety of its exercise in any case cannot be reviewed by the courts. (*Per* T. R. STRONG, *Justice.*)

Most, if not all of the strength of the argument to sustain the *unconstitutionality* of this law rests upon the idea, already attempted to be refuted, that the authority sought to be conferred by the legislature, and the object of the law, are of a *private and not* of a public nature. Viewing them in a light directly the *reverse,* they are readily seen to be harmonious with every part of the constitution. (*Per* T. R. STRONG, *Justice.*)

*Cayuga General Term, March,* 1857.

*Present,* JOHNSON, STRONG *and* SMITH, *Justices.*

APPEAL from a judgment entered upon the order of Judge ALLEN. Case argued at Rochester, March, 1857, and decided at the late Cayuga general term.

E. GRIFFIN & O. HASTINGS, *for appellant.*

S. MATTHEWS, *for respondent.*

By the court—E. DARWIN SMITH, Justice. This action was brought to recover the sum of $41,740, paid for principal and interest by the plaintiff, upon a contract for the sale to him, by the defendant, of $3,000 shares of the stock of the Rochester and Genesee Valley Railroad Company, issued under and in pursuance of §§ 285 to 292 inclusive, of an act to amend the charter of the city of Rochester, passed July 3d, 1851.

The learned judge, before whom the cause was tried without a jury at the circuit, has found, as a conclusion of law upon the facts stated in the case, that the said sections (285 to 292 in-

clusive, of the act aforesaid,) never became a valid law of the state, and that the subscription to, and the taking of the said 3,000 shares of the stock of the Genesee Valley Railroad Company, authorized and taken under said sections, were illegal and void; that the several payments made by the plaintiff to the defendant therefor were made without consideration, and that the plaintiff was entitled to rescind the said contract and require the repayment, and recover against the defendant the several sums with the interest thereon, and accordingly rendered judgment for the plaintiff for the money so paid, deducting certain offsets specified in the case. From this judgment the defendant has appealed to this court, and we are called upon to review the decision of the circuit judge upon the single question, whether the said sections of the act aforesaid were or were not constitutional and valid?

Under our republican system the powers of government are distributed to the executive, legislative and judiciary departments. It is the exclusive province of the legislature to enact the laws, and to pass upon all questions relating to their expediency, the time, manner and mode of their operation. It pertains to the judiciary to interpret the laws thus enacted, and to carry the same into effect. Acting in common with the legislature under the constitution, which both are sworn alike to support, it is our duty to bring all laws, when called upon in due form to enforce them, to the touchstone of the constitution, and to pronounce against the validity of all acts clearly in conflict with the fundamental law.

The invalidity of the act under which the defendant took the stock and issued the city bonds in question, is placed by the learned judge who tried the cause at the circuit, as appears from his opinion, upon *two* grounds:

*First*, on the ground that the sections of the act conferring the power upon the mayor and common council of Rochester to subscribe for the stock in the Genesee Valley Railroad Company, and issue bonds to pay for the same, were not duly passed in conformity with forms prescribed in the constitution.

*Secondly*, on the ground that the legislature could not confer

upon municipal corporations, and the defendant could not exercise the powers of subscribing to the stock of a railroad company, and issuing bonds of the city as authorized by the charter in question.

In approaching the discussion of the questions presented upon this appeal, it is impossible that we should be insensible to the great importance of the cause, and of the uncommon magnitude of the interests involved in its decision.

Aside from the $300,000 of the bonds of the city of Rochester in question in this action, now doubtless in the hands of innocent holders, who have purchased them for their full nominal amount, probably millions of other bonds of like character have been issued by other city and town authorities, all to be affected by our decision. The pecuniary loss to individuals which the affirmance of the decision of the circuit judge will involve, the check it will give to many important public improvements in this state and elsewhere, and the disastrous influence it must have upon public credit, and upon the character of the cities and towns, and of the states under whose authority and laws these bonds have been issued, can scarcely be over estimated.

Considerations of this kind, while they cannot be unheeded or unappreciated by the court, cannot be permitted to divert us from our duty to declare the law according to our convictions, irrespective of the consequences. They may, however, most fitly be permitted to exercise a proper influence in impressing upon us the duty of more than ordinary carefulness in our investigations, deliberations and conclusions.

The first question presented upon this appeal is purely one of *form*.

It is not the first question in order discussed in the opinion of the circuit judge, but meets us *in limine* in the case, and should, we think, be first considered: for if the objection it presents is well taken, it is necessarily conclusive of the cause. This question is based upon the decision of the court of appeals in *Barto* agt. *Himrod*, 4 *Selden* 483, *and Thorne* agt. *Cramer*, 15 *Barb.* 112; *and Bradley* agt. *Baxter, id.* 122.

These cases arose under the act "to establish free schools

Clarke agt. The City of Rochester.

throughout the state, passed March 26, 1849." The tenth section of that act was as follows:—

" The electors shall determine, by ballot at the annual election to be held in November next, *whether this act shall or shall not become a law.*"

Sections 11, 12, 8, 13, provide for submitting the question to the people at the next election, and prescribe the form of the proceedings for that purpose.

The 14th section was as follows:—

" In case a majority of all the votes in the state shall be cast against the new school law, this act shall be null and void; and in case a majority of all the votes in the state shall be cast for the new school law, *then this act shall become a law,* and shall take effect on the first day of January, 1850."

The court of appeals held that this act was invalid, " because the provisions contained in it in relation to free schools were never constitutionally enacted."

Judge RUGGLES, who gave the leading opinion, says of the provisions of the act, that " they were not law, or to become law, until they had received a majority of the votes of the people at the general election in their favor, nor unless they received such majority. It results, therefore, unavoidably from the terms of the act itself, that it was the popular vote which made the law. The legislature prepared the *plan* or *project,* and *submitted it to the people to be passed or rejected.*"

Judge WILLARD, who also gives an opinion in the case, says of it : " In short, the law was a mere *proposition submitted to the people, to be adopted or rejected, as they please.*"

It is upon this ground that the decision was put; that the act in question had none of the properties of a law ; that it was a mere *project* or *proposition* of the legislature, submitted to the people for their adoption or rejection. It is, of course, an authoritative and binding adjudication upon the case presented, and affords a conclusive rule for the decision of all cases depending upon the same facts. While we bow to its decision on the point presented, we are at liberty to dissent from some of the reasoning advanced for the decision, and submit with

respect that the soundness of some of the conclusions or views contained in the opinions of the learned judges who gave the opinion of the court, may well be questioned. But the case, doubtless, establishes the rule in this state, that the legislature cannot evade the responsibility of passing *general acts* by submitting a project of a law to the people, for their acceptance or rejection.

2d. We come, then, to the question, whether the rule thus established applies to the sections of the act to amend the charter of the city, under which the points in controversy now presented to the court have arisen. The act in which these sections are contained, is entitled " An Act to amend an act entitled An Act to Amend and Consolidate the several acts relating to the City of Rochester, passed April 10, 1850, passed July 3d, 1851, three-fifths being present, as the same appears in the Session Laws of 1851, chap. 38–9, p. 757."

The act consists of twenty-four sections containing provisions in respect to a great variety of particulars before it comes to the §§ 285, 286, 287, 289, 290, 291 and 292, in question, which are additions to the charter.

Section 285 declares that, " It shall be lawful for the common council of the city of Rochester to borrow on the faith and credit of said city, any sum of money not exceeding three hundred thousand dollars, for a term not exceeding twenty years, at a rate of interest not exceeding seven per cent. per annum, and to execute bonds therefor under the corporate seal and the signature of the mayor, and such other officers as the common council may designate. The bonds so to be executed may be in such sums, and payable in such places and times, not exceeding twenty years, and in such form as the common council may deem expedient."

Section 286 authorizes the common council to dispose of such bonds in such manner as they shall deem advantageous for the city, and the money which shall be so raised to be invested in the stock of the Rochester and Genesee Valley Railroad Company, and employed and used in the construction of said railroad *buildings* and *appurtenances, and for no other purpose,* and

Clarke agt. The City of Rochester.

the common council was authorized to subscribe for or purchase said stock to the amount of $300,000, the city to acquire all the rights and privileges, and be liable to all the responsibilities of stockholders.

Section 287 provides that the dividends to be received on the stock shall be applied to pay the interest on the bonds, and in case of a deficiency, the amount to be made up by taxation in the same manner as other city expenses.

Section 288 allows the common council to loan the money to be received on the bonds, before it shall be required in the construction of the road, to banks.

Section 289 authorizes the common council to exchange the stock for the bonds or to sell the same.

Section 290 provides that the common council shall nominate and appoint one director in the railroad company for every $75,000 of stock held by the city at the time of any election of directors.

Section 291 declares that the preceding §§ 285, 286, 287, 288, 289, 290, together with this section, (§ 291,) shall not take effect until they shall be submitted to the electors of the city of Rochester qualified to vote for charter officers of said city, at such times as the common council shall direct, for the purpose of determining " *whether or not it is expedient for said city to borrow the money mentioned in said sections for the purpose therein specified;*" and provides also particularly how the election shall be conducted, the votes canvassed, the result ascertained, and a certificate thereof filed in the city clerk's office, in the same manner as at the other charter elections.

Section 292 is as follows:—

"If the said sections, 285, 286, 287, 288, 289, 290, 291, shall be approved by two-thirds of the votes of the electors of said city, and voting at such election as above prescribed, then the same shall take effect immediately after the filing of the certificate of such approval of the said act by the mayor and clerk of the said common council."

In construing this statute, both in reference to its constitu-

tionality and in respect to its legal force and operation, we are to be governed by certain clearly defined rules.

*First.* In respect to its constitutionality. We can declare an act of the legislature void only when it violates the constitution, *clearly, palpably, plainly,* and in such manner as to leave *no doubt* or *hesitation* on our minds.

This rule is very generally asserted in the courts of this country by the judges of the United States and state courts. (6 *Cranch,* 87; 4 *Dallas,* 14; 3 *Sergt. and Rawle,* 178; 12 *Wheaton,* 270; 10 *Conn.* 522; 1 *Cow.* 550; 13 *Pick.* 60; 21 *Penn.* 9; *Sharpless* agt. *The Mayor of Philadelphia, Harris,* 164.) In *Adams* agt. *How,* (14 *Mass.* 345,) the rule is thus stated : " The legislature is, in the first instance, to be judge of its own constitutional powers; and it is only when manifest assumption of authority, or misapprehension of it, *clearly appears,* that the judicial power will refuse to execute the law." And in *Wellington* agt. *Petitioners,* (16 *Pick.* 95,) Chief Justice SHAW says the courts should " never declare a statute void unless the nullity and invalidity of the act was placed in their judgment beyond reasonable doubt;" and such is the rule as laid down by the judges in most of the state courts. So, in the exposition of a statute, it is the duty of the court to seek, to ascertain and to carry out the intention of the legislature in its enactment, and to give full effect to such intention; and they are bound so to construe the statute, if practicable, as to give it force and validity rather than to avoid it, or render it nugatory. (*Dwarris on Statutes,* 690; 2 *Rol.* 126; 11*th of Coke,* 73.)

Looking at this act in the light of these principles, and assuming that the legislature had no purpose in its passage to transcend its constitutional powers, we come, then, to the inquiry, what is the true interpretation of the act in respect, in this connection, to the principles and rules which must govern the enactment of laws, as declared in the case of *Barto* agt. *Himrod.*

The inhabitants of the city of Rochester were, many years since, created a corporation for municipal purposes, by the name of " The City of Rochester." The act of July 3, 1851,

was an act amending the charter of the city, and contains a great variety of provisions, enlarging and modifying the powers previously granted. The incorporation of the §§ 285 to 291 inclusive, in the act, was designed as an enlargement of the powers of the city government.

Municipal, like private corporations, derive all their powers from the legislature, which may grant such powers as it pleases, and may enlarge, abridge, or take away such powers as are of a pure municipal character in its legislative discretion. The power conferred upon the common council in these sections, we will assume at this stage of the discussion, to be entirely within the limits of the legislative power. In § 285 explicit power is given to the common council to borrow $300,000, on the faith and credit of the city, and issue bonds therefor under the corporate seal.

Section 286 directs that the money so borrowed shall be invested in the stock of the Genesee Valley Railroad Company, and *employed* and *used in the construction of the said railroad.* The intention of the legislature was very clearly to give to the city of Rochester power to aid, with this $300,000 in the construction of the Rochester and Genesee Valley Railroad.

This road, it appears in the case is, " a road commencing at the city of Rochester, and running southerly along the valley of the Genesee river, and when completed is to terminate at Portage, in the county of Allegany." That this enterprise was one of public utility, and one locally beneficial to the city of Rochester, the legislature have clearly determined. Whether it was to be relatively of such local benefit as to warrant the city in incurring a debt of $300,000 for its construction, was a question the legislature did not decide. It gave the power and left it for the corporation, the body of the citizens, to determine that question for themselves. The power thus conferred upon the people of Rochester was not within the case of *Barto* agt. *Himrod*, a delegation of the power to *pass the law*, put a fit and proper restraint or limitation upon the power granted in the said act, and entirely within the limits of the legislative discretion. The act itself was complete when it had passed the two

houses of the legislature and received the signature of the governor. It had all the attributes of a law. It was *perfect, final* and *decisive in all its parts.* Its final section, in explicit terms, declares that, " *This act shall take effect immediately.*" It imparted new power to the corporation, which it might or might not accept and exercise ; but the legislature had done all its duty in the matter—exercised its full discretion on the subject, and left it for the city to accept or not, the power conferred. It left no matter to the discretion of the citizens of Rochester except what related to the execution of the law.

The power to make a law includes and implies the power to fix and determine its *terms, conditions* and *provisions.* No such power was conferred by this act. The question referred to the electors of the city of Rochester, was, in substance and effect, whether the charter privileges offered by the legislature should or should not be accepted.

The election to be held, as prescribed in § 291, was "*for the purpose of determining whether or not it was expedient for said city to borrow the money mentioned in said sections for the purpose therein specified.*"

The legislature passed an act giving enlarged power to the common council, subject to the acceptance, assent and approval of the corporation.

The common council is not the corporation. It is the mere local legislature of the city.

The inhabitants of the city are the corporation. (§ 2 *of Charter.*)

The legislature provided that the powers specified in these sections should not be exercised by the common council without the consent of the corporators, to be ascertained in a prescribed legal form of an election.

The powers specified in the sections were dormant—were yet *in fieri,* until the corporators accepted them and assented to their exercise, (4 *Wheaton,* 688,) precisely as in the case with every charter to a municipal or private corporation ever granted by the legislature. Every such charter, and every enlargement of its powers and franchises, require the assent and acceptance

of the corporators. This consent may be, and ordinarily is *implied*, from the application for the charter—the beneficial nature of the grant, or the exercise of the corporate powers—but, in principle, it is supposed to be always given, either expressly or impliedly. (*Angell on Corporations*, 51; *Kyd on Corporations*, 65; *Willcock on Municipal Corporations*, 27, 28, 29, 30; 4 *Wheat.* 518.)

In this case the legislature deemed it fit to require an *express acceptance* of the powers proposed to be conferred upon the legislative agents of the defendant before they should have authority to commit the corporation to the large debt in question, and the contingent liability to the taxation involved in its creation.

It was entirely optional with the city of Rochester whether the proposed grant of power should or should not be accepted. The state could not enforce the grant upon the city against its will, and this would have been so if the provision for an express acceptance of the new charter had been omitted. (*Willcock on Municipal Corporations*, 30; 3 *Hill*, 541; 3 *Term Rep.* 240.)

It is therefore a case of proper and legitimate, if not necessary, *conditional legislation*. It is the precise case mentioned by Judge RUGGLES in *Barto* agt. *Himrod*, of a statute which is a law *in presenti*, to take effect *in futuro*. It is a perfect grant of power, to take effect on its acceptance by the corporation. It is just such conditional legislation, in substance and effect, as our statute books are full of, from the time the people of this state assumed the right to govern themselves, and pass through their own legislature such laws as they deemed best adapted to promote their welfare and happiness. The act amending the charter of the city of New-York, and providing for the construction of the Croton water works, was just such an act, and provided for the express acceptance of the grant in the same manner as in this case. (*Vide Sess. Laws*, 1834, *p.* 451.)

Of all the various charters of cities, banks, turnpike and railroad companies, and other numerous municipal and private corporations, organized in this state since the Revolution,

the acts have not uniformly created the corporation in *express words.*

· They have in many, if not in most cases, merely conferred a power of authority to organize the corporation. Acts *in pais,* in acceptance of the charter, in adopting it, complying with its provisions, and organizing under it, have generally been essential to bring the corporation into being. Have the corporators in all these cases created the corporation? The legislature, a few years since, authorized the Rochester and Auburn and the Auburn and Syracuse Railroad Companies, with the consent of their stockholders, to consolidate their stock and organize a new corporation.

The Rochester and Syracuse Railroad Company came into corporate existence under this act. And a few years subsequently, all the railroad companies between Albany and Buffalo were authorized to unite their stock and capital and organize a new company. They did so, and named it the New-York Central Railroad Company. Did the legislature, or these railroad companies create the new corporations? Numerous other instances of like conditional legislation in granting provisional powers might be cited.

This principle is well stated by Judge MARSHALL, in *Slack* agt. *The Maysville and Lexington Railroad Company,* (9 *Mon: Rep.* 526.) He says, "It is not essential to the character and force of a law, that the legislative enactment should itself command to be done everything for which it provides. The legislative power to command a particular thing to be done, includes the power to authorize it to be done. The act done under authority conferred by the legislature, is as precisely legal and valid as if done in obedience to a legislative command. So far as such statute confers authority and discretion, it is as obligatory from the first as the legislative power could make it; and although its further practical efficiency may depend upon the discretionary act of some other body or individual, it is not derived from that, but from the will of the legislature, which authorized the act, and prescribed the consequences."

And, in *Rice* agt. *Foster*, (4 *Harrington*, 479,) decided by the court of appeals of Delaware, the chief justice says, "A law altering, abridging, or enlarging the vested powers of corporations aggregate, subject to the consent of the corporation, or a law giving to school districts a portion of the school fund, on condition that such district will raise an equivalent or proportional sum, are all instances of proper conditional legislation, even though the assent of the corporation, in the one case, to the change of their charter, or of the district, in the other, to accept the donation, and comply with its terms, should be signified by a majority vote. They are all good conditions, capable of being performed without in any way interfering with the legislative will."

And again the same learned judge says, "To say that the authority given to the school voters, the members of a corporation, to determine whether a tax shall be laid or not, is a grant of legislative power, is an abuse of language."

In the same case, Judge HARRINGTON asserts the same views.

And in the very able opinion of Judge RANNEY, who gives the unanimous opinion of the supreme court of Ohio, in a case in all its particulars quite like this, (*M'Cook's Ohio Rep.* 78,) after speaking of the school laws of the state, and the erection of town houses by vote of the town, he says, "Every act of incorporation ever passed necessarily refers the question of its acceptance to the corporators—these, all present cases where the discretion is left to the body of those interested, or to be affected.

" But because such discretion is given, are these and all other similar enactments to be deemed imperfect and nugatory? It would take a bold man to affirm it. In what does the discretion consist?

" Certainly not in fixing the terms and conditions upon which the act may be performed or the obligations thereupon attaching. These are all irrevocably prescribed by the legislature, and whenever called into operation, conclusively govern every step taken."

Also in *Moors* agt. *The City of Reading*, (9 *Harris's Penn.*

*Rep.* 202.) In a case where it had been left to the voters of the city of Reading to determine whether the city should take stock in a railroad company, the supreme court held that "there was no delegation of legislative power, and they could see no reason why the *acceptance* of a new power, tendered to a public corporation, may not be made to depend on the will of the people, when it is expressed by themselves, as when it is spoken by the mouths of their officers and agents."

To say, in this case, that the act vesting the power in the common council to contract the debt and subscribe for the stock, subject to the acceptance of the citizens of Rochester, on their approval thereof in the form prescribed, was a delegation of legislative power, was conferring power upon the citizens of Rochester to *pass the law*, is truly as was said by my brother Johnson, in *Johnson* agt. *Rich*, (9 *Barb*. 684,) a "sheer confounding of all proper distinctions"—is an abuse of language, and so to hold would be a gross invasion of the discretion and rightful authority of the legislature.

But upon the question of *form*—so far from being clearly and palpably unconstitutional, we think the act in question is, in substance and effect, in the form and after the model suggested or prescribed in the constitution itself, in relation to the *same subject matter*, the *creation of public debts;* and is, in this particular, in precise and distinct conformity with its spirit and intent.

Probably no single sentiment was more pervading in the public mind, shortly before the convention of 1846, or more contributed to the calling of the convention, than a desire to impose some restraint upon the power of the legislature to contract public debts. The country had just passed through a period of extreme financial embarrassment. Many state and corporate debts had been repudiated, or the interest thereon had not been paid, and it perhaps may not be amiss, or do any injustice to history, to say, that there was prevailing throughout the whole country, at that time, a sort of feverish excitement on the subject of state and corporate debts. The members of the convention, elected under the influence of this sentiment, doubtless

thoroughly sympathized on this subject with this general feeling of the people. Their apprehensions and their remedy in respect to this great evil, are illustrated in the seventh article of the constitution.

Section 9 provides that the credit of the state "shall not, in any manner, be given or loaned to, or in aid of, any individual, association or corporation."

This provision cuts up one prolific source of the evil complained of. Section 10 limits the power of the state to borrow money to meet casual deficits and failures of revenues and expenses not provided for, to the amount of $1,000,000.

Section 11 allows other debts to be contracted to repel invasion, suppress insurrection, and defend the state in time of war: and § 12 provides that no debt, except the above, shall be contracted, unless such debts shall be authorized by a *law* for some single work—such *law* to impose a tax to pay interest and discharge the principle within eighteen years—and "no such *law* shall *take effect* until it shall have been submitted to the people, and have received a majority of all the votes cast for or against it at such election."

" On the final passage of such *bill*, the question shall be taken by ayes and noes," &c., "to be duly entered on the journal thereof, and shall be, 'Shall this bill pass, and ought the same to receive the sanction of the people.'

" The legislature may, at any time after the *approval of such law by the people*, forbid the contracting of the debt," &c.

" No such *law* shall be submitted to be voted on within three months *after its passage*, or when *any other law* shall be submitted to be voted for or against."

It will be seen above, that before the passage of an act providing for the contracting of a state debt under the foregoing provisions of the constitution, the project or proposition is appropriately called *a bill*. After it has passed the two houses, and before its approval by the people, it is called *a law*—of course the governor's signature to it is to be implied, for this must necessarily precede its submission to the people.

By the language and clear implication from the terms of this

section, the *bill* has become and is a *law*, before its submission to the people. It is not submitted to the people to *pass the law.* It is complete and perfect when it is submitted, and is submitted for the *approval of the people.* To call this legislation by the people is an entire misnomer, a total misconception of the whole section and its object. It was designed simply as another *check* to hasty and improvident legislation, in addition to the veto of the governor.

It was designed, in the expressive language of Mr. Hoffman, the chairman of the committee who reported it to the convention, as another "safeguard," "to protect the people in all their rights from the dreadful calamity of a great debt." This safeguard was the people at large.

In the precise *form* prescribed by the constitution to the legislature when it is proposed to create a *state debt*, and in the precise language of the constitution itself when such is the object, the legislature have passed the amendments to the charter of the city of Rochester in question in this suit.

The reason being the same for the same course of proceeding where the object of the proposed law is to create a *city* or *corporate debt*, the legislature have adopted the same mode of proceeding as *though* it were a state debt. It has left it to those who are to be liable *to pay* the debt, if one is contracted, to say whether the debt shall or shall not be contracted. The spirit—the prescription of the constitution has been, in this instance, most faithfully followed and obeyed. It cannot be, that an act thus passed can fairly be pronounced to be *clearly* and *palpably* in conflict with the constitution.

It may be that the people will judge and decide unwisely in respect to state and city debts under such submissions to them; but who has the right so to say? If the people of such a city as Rochester in respect to a proposed city debt, or the people of this state at large in respect to the contraction of a state debt, cannot be trusted to decide finally the question for themselves, the whole theory of popular sovereignty is a delusion, and it must be admitted that our people are incapable of self-government.

In all forms of government there is doubtless much abuse in the contracting of public debts, but in this particular it has always been supposed in this country, that republican government afforded the best guaranty for the protection of the interests of the people, in the fact that those who are to *bear the consequences* involved in the contraction of such debts must themselves consent to, or *commit the folly.*

But if this consideration be not sufficient to deter a practical and highly intelligent people from rushing heedlessly and improvidently into debt, it is not the duty of the judiciary to save them from learning such a salutary lesson of wisdom as the tax gatherer is particularly adapted to inculcate, or to relieve them from the dishonor of repudiation, by a doubtful interpretation of the law, or a strained and questionable construction of the constitution.

*Secondly.* We come next to the second question for discussion, whether, independent of the questions above discussed, the legislature could constitutionally confer, and the city could possess and exercise, the power specified in the sections of the charter aforesaid.

I do not understand, from the opinion of the circuit judge, that he finds any section or portion of the constitution with which these sections of the charter come expressly in conflict, upon which he rests his opinion, or that they violate *directly* any particular provision of the constitution, except incidentally as hereinafter mentioned.

The chief argument of the learned judge is, that the subscription to this stock, and the issuing of the city bonds to pay therefor, involve, or may involve, a resort to taxation to pay the principal and interest, in whole or in part, upon the bonds; and that municipal corporations, being organized only for political purposes, can only exercise, or be authorized to exercise the right of taxation "in respect to the proper public burdens incident to the city government and the exercise of the political powers." The learned judge says, in another part of his opinion, that "the decision of the question might very properly be rested, in the absence of any express power conferred by the

people, in the constitution, and aside from any of the prohibitory and restraining clauses in the instrument, upon the absolute want of power in municipal corporations to burden or tax the property of the citizens for the purpose named, and the want of jurisdiction in the state legislature to confer the right."

This view involves a discussion of the theory and powers of government under our system. At the Revolution all power reverted to the people, and they were at liberty to institute and establish such government as they deemed best calculated to secure their rights and liberties, and most conducive to their safety and happiness.

In their original capacity, through delegates to a convention for that purpose chosen, they ordained and established the present form of government, and vested the supreme legislative power of the state in two separate bodies of men, one called the ASSEMBLY and the other the SENATE.

The legislative power thus vested was and is undefined and unlimited in terms, as it is in its nature undefinable as to its extent. All the original inherent power of the people to legislate for themselves, to provide for their general welfare, and to promote their common interest and happiness, was conferred upon the legislative department of government thus created.

The powers of the legislature were then, and are still as omnipotent as those of the British parliament, except as the people have since delegated portions of their original power to the general government, and have restricted or limited the legislature in our state constitution.

The constitution of the United States, and that of our own state, constitute the only restriction or limitation of the legislative power. It is, aside from these limitations, supreme, uncontrolable and omnipotent, in respect to all other matters and subjects. The taxing power is one of the inherent powers of government, and belongs appropriately to the legislative department. (4 *Wheat.* 428; 4 *Peters,* 514, 561 *and* 563; 4 *Com.* 419 *and* 29; 3 *Ker.* 144.)

Within the limits of legitimate taxation, the legislative dis-

cretion is utterly uncontrollable, as it is undefinable in its *objects, purposes, uses* and *extent.*

The legislature cannot, under this taxing power, take the property of one man and transfer it to another, for that would violate the provision of the constitution that "no one shall be deprived of life, liberty, or property, without due process of law."

It cannot take the property of individuals for public use without just compensation; but short of that extent, and so far as the tax is general, or imposed upon all, or all of a class of persons, within prescribed limits or districts, upon some common principle or rule, and the tax is for some public purpose, there is no limit to the power of the legislature to authorize taxation, and no remedy or mode of correction for unjust laws involving such taxation, but at the ballot box. (3 *Ker.* 428; *opinion of* SELDEN, *J., Winehammar* agt. *The People,* 4 *Com.* 430.)

This brings us to the inquiry what works or objects are for *public benefit,* or are of such a public character as to justify such taxation.

Railroads are clearly works constructed for the public benefit. They are not mere private enterprises, built and operated exclusively for the benefit of the stockholders. The right of private corporations to take property is the right of the state— the right of eminent domain, and can only be justified and sustained on the ground that the lands so taken are taken for the public use. Lands for this purpose may be so taken on payment of a just compensation, precisely as the state might, by its own agents, take the same.

This is the ground upon which this right was put by the chancellor in *Beekman* agt. *The Saratoga Railroad Company,* (3 *Paige,* 45,) and by the supreme court in *Bloodgood* agt. *Mohawk Railroad Company,* (14 *Wend.* 57,) which last case was affirmed in the court for the correction of errors; (18 *Wend.* 9;) and the same doctrine has since been repeatedly acted upon, and asserted in the courts of this state.

The doctrine of all these cases is, that the state itself might construct these works at the public expense; and that what it

may lawfully *do* for the public benefit it may authorize corporations to do as its agents. The state might construct these railroads by its own agents with the funds of the state, as it does canals; or it might take stock in all or any of these railroad companies.

The state was a stockholder in all the early banks chartered in this state—in the Bank of North America, the New-York Bank, the Albany Bank, the Farmer's Bank, and the State Bank, and most others chartered under the constitution of 1777.

Instead of building railroads, turnpike roads, constructing bridges over large streams, making slack-water navigation upon our rivers, and doing many other acts of internal improvement, the state has authorized corporations to do the same thing.

Such has ever been the policy and the practice of the state since it exercised the powers of an independent sovereignty.

But if the state had undertaken to construct all such works as state works for the benefit of the state, as it has the canals, many of such works would, and must obviously be of especial local benefit to some parts of the state, and of no particular benefit to other parts.

Can there be any doubt that the state might have imposed taxes in respect to such questions of local benefit?

Could it not tax cities, or towns, or counties, to meet such local benefits? And if it had done so, who could question the legislative discretion or power on the subject?

All the taxes and assessments of the municipal corporations were made and sustained upon the ground of benefit locally conferred.

In 4 *Comstock*, 424, Judge Ruggles says, "Taxation exacts money or services from individuals as and for their respective shares of contribution to any public burdens."

Municipal corporations possess, too, in a large degree, the rights and franchises of private corporations. All cities, as such, have more or less property. They own, or may own, their water-works, school and market houses, city halls, court-houses, bridges, (and in some instances collect toll thereon,)

and other works, and for aught I can see, under state authority, might erect and operate a flouring mill for the benefit of the inhabitants of the city.

This consideration seems to have been overlooked by the learned circuit judge. The views expressed in his opinion treat municipal corporations as *mere political bodies*, created for purely governmental purposes, and incapable of exercising any other powers. The chief design of municipal corporations is, doubtless, to promote the interests of the locality in respect to mere civil government, but other powers and franchises may be annexed to and exercised by the corporations, as is probably the case with most of the municipal corporations in the state.

In the case of *Bailey* agt. *The Mayor of New-York*, (3 *Hill*, 481,) Chief Justice NELSON, giving the opinion of the supreme court, puts the liability of the corporation to pay for damages resulting from the unskilful construction of a dam across the Croton river, for the supply of water to New-York city, upon the express ground that the defendants, *quo ad hoc*, were to be regarded as a private company. He says, "It [the corporation] stands on the same footing as would an individual or body of persons upon whom the like special franchise had been conferred," and cites a large number of authorities on the point.

This decision, too, was affirmed in the court for the correction of errors. (2 *Denio*, 433.) In this case, Chief Justice NELSON puts a hypothetical case quite in point. He says,

"Suppose the legislature, instead of the franchise in question, had conferred upon the defendants banking powers, or a charter for a railroad leading into the city in the usual manner in which such powers are conferred upon private corporations, could it be doubted that they would have the same character, and be subject to the same duties and liabilities?"

How far it is wise to confer such franchises upon municipal bodies, may well be doubted; but that is a question for the legislature. In all such cases, and upon all such questions, the legislature is the exclusive power to determine what franchises shall be conferred upon municipal and private corporations, and to determine also upon the expediency of the construction

of any class of improvements, and to determine the question whether they are or are not works for the public benefit.

No power exists under the constitution to review their decision, except the power of the people to change their legislators.

Certainly the judiciary has no power to review the decision of the legislature upon such questions. To do so would be to assume the rights of council of revision, would make the judiciary a sort of despotic power in the state to determine what laws the people should or not make,—would make it a power odious and unendurable.

The subscription to the stock of the railroad by the city, and the issuing of the city bonds to pay for the same, does undoubtedly, as the learned judge holds, involve the necessity of levying a tax to pay principal and interest, and if such tax cannot lawfully be imposed, the act, or section thereof in question, must be invalid.

But the right of the legislature to authorize a local tax, it seems to us, cannot *seriously be* controverted. It is distinctly asserted in the case of *Thomas* agt. *Leland*, (24 *Wend.* 65,) where the legislature authorized a tax upon the city of Utica to defray the expense incurred by a change in the termination of the Chenango canal.

It is also distinctly asserted in the opinion of Chancellor WALWORTH, in the case of *The Mayor of New-York* agt. *Livingston*, in the court for the correction of errors, (8 *Wend.* 110,) in these words:

"It is a well-settled principle, that when any particular county, district or neighborhood is exclusively benefitted by a public improvement, the inhabitants of that district may be taxed for the whole expense of the improvement in proportion to the supposed benefits received by each."

This case and doctrine is substantially re-affirmed by the court of appeals, in *The People* agt. *The Mayor of Brooklyn*, (4 *Com.* 436; 3 *Ker.* 144.)

That railroads are public improvements which the state may construct itself or authorize to be constructed by corporations;

Clarke agt. The City of Rochester.

that the state may be a stockholder in such a corporation, and may also authorize municipal corporations to become stockholders therein, and may levy taxes to pay interest and principal upon such stock, and authorize municipal corporations to levy a local tax for that purpose, is also fully established by the following cases in other states :—

In the case of *Sharpless* agt. *The Mayor of Philadelphia*, (21 *Penn. State Rep.* 9 *Harris*, 148,) in which the opinion, of remarkable ability, is given by the late chief justice, now attorney-general of the United States.

Also, in the case of *The Cincinnati Railroad Company* agt. *Clinton County*, (1 *M'Cook's Ohio State Rep.;*) in which case the unanimous opinion of the court is given in a most able and complete discussion of the whole subject, by Judge RANNEY.

Also, in *City of Bridgeport* agt. *Housatonic Railroad*, (15 *Conn. Rep.* 475.)

Also, in the case of *Goodwin* agt. *Crump*, (8 *Leigh*, *Virg. Rep.* 120;) in which the court of appeals of Virginia affirmed the power of the legislature to enlarge the corporate powers of the city of Richmond, *with the assent of a majority*, so as to enable it to subscribe to stock of the James River and Kanawha Company, incorporated for the purpose of uniting the water of James river with the Ohio by a canal or railroad, and bind the minority.

Also, in the case of *Nicol* agt. *The Mayor of Nashville*, (9 *Humph. Rep.* 352;) in which a law authorizing the city of Nashville to subscribe to the stock of a railroad was sustained by the supreme court of Tennessee.

Also, in the case of *Talbot* agt. *Dent*, (9 *B. Monroe*, 526,) in which the validity of a subscription by the city of Louisville to the stock of the Louisville and Frankfort Railroad Company was sustained; and also in the case of *Slack* agt. *The Maysville and Lexington Railroad Company*, *supra*, by the courts of Kentucky; and also in the case of *Cheney* agt. *Howe*, (9 *B. Monroe*, 250.)

This current of authority from six other states, having substantially the same constitutions, so far as it relates to the sub-

ject in question, and the same common law, ought to be quite decisive on this question.

The doctrine of the learned judge, in holding that the invalidity of the sections of the act in question may be "rested upon the absence of any express power conferred by the people in the constitution upon the legislature, to authorize a municipal corporation to burden or tax the citizens for the purpose named therein," is thus in conflict with the whole theory of our government relating to the legislative power. It proceeds upon the principle that the powers of the state government, or the state legislatures, are *delegated* powers, which is opposed to what is generally understood and received as sound law in respect to the relative powers of the national and state governments. If there be any doctrine that may be deemed settled, so far as to have the force of a political and legal axiom, it is that the powers of the general government are *delegated* and those of the state governments are *original and reserved.*

The views of the learned judge, so far as they go to *imply* a restriction upon the legislative power to authorize the subscriptions to the stock in question by the defendants, are clearly untenable, if the preceding views are correct, and if it be true that the courts should only declare a law void where it is clearly in conflict with some particular provision of the constitution.

Laws may doubtless be held invalid when they *impliedly* violate the constitution, as much so as when they expressly come in conflict with some of its distinct provisions. But in such case the implication must be *necessary* and *legitimate,* and based upon some express portion of the constitution. If the legislature, for instance, should pass an act directing a new trial of a cause in a court of law, or granting a pardon after conviction for some criminal offence, we could say the acts were void, on the ground that the legislature had invaded the province of the judiciary, or that of the executive department.

So in a great variety of cases that might be suggested, where the acts of the legislature are not within the scope of the powers conferred by the constitution upon the legislative department,

or exceed the limits of its power, defined or restricted, in respect to some particular subject matter.

But the implication, in all such cases, would rest upon some particular provision in the constitution, and must be *clear* and *indisputable*, on a fair construction of the constitution, and beyond *reasonable doubt*. (8 *Cranch*, 87, *Fletcher* agt. *Peck*, 2 *Monroe*, 178; *City of Louisville* agt. *Hiatt*, 9 *Dana*, 514.)

But the learned judge does not rest his opinion, in respect to the invalidity of these sections, entirely " upon the implications arising from the constitution, its object, spirit, and general provisions."

In one part of his opinion he says, " I will simply refer to a provision which, I think, expressly forbids the legislature to grant the power which the act in question assumes to confer upon the common council of Rochester, and refers to the ninth section of article eight of the constitution, which is as follows :—

Section 9. " It shall be the duty of the legislature to provide for the organization of cities and incorporated villages, and to restrict the power of taxation, assessment, borrowing money, contracting debts, and loaning their credit so as to prevent abuses in assessment, and in contracting debts by municipal corporations;" and the judge also says, in respect to the same section of the constitution,

" The power to tax property in aid of a private corporation, as for the purchase of its stock, is not among the ordinary powers of a municipal and local government, and requires special legislation to confer it, and this special legislation I think clearly forbidden by this section of the constitution."

This section of the constitution contains in itself, no express prohibition upon the subject. It is merely directory to the legislature, and is entirely inoperative of its own force upon the subject to which it relates. It leaves the whole subject, as before, with the legislature, and impliedly allows that the corporation may contract debts without legislative prohibition, and certainly under the legislative authority expressly given. If the legislature could *prohibit*, it can *allow* debts to be created,

and it has expressly done so in this instance, and before **it** had acted at all under the aforesaid section.

But if it were otherwise, the legislature could *repeal* what it had enacted.

The whole subject is left with the legislature, as Judge RUGGLES says, in *The People* agt. *Mayor of Brooklyn,* (4 *Comstock,* 440,)

" The direction given to restrict the power of cities and villages to make assessments, presupposes and admits the existence of the power to be restricted, and seems to remove all doubt in relation to the legislative power in question."

How the learned judge can so construe this section as to make it of its own force, a constitutional prohibition upon the legislature, and upon municipal corporations, I cannot conceive. To analyze the section more clearly, the first clause is as follows : " It shall be the duty of the legislature to provide for the organization of cities and incorporated villages."

This duty to provide for their organization implies and recognizes a discretion in the legislature in regard to the *terms, powers* and *provisions* to be contained in the charters of cities and villages.

Again : " And to restrict the powers of taxation, assessment, borrowing money and loaning credit."

This clause also implies and recognizes both a right in the corporations, without restriction, to tax, make assessments, borrow money and loan credit ; and also a discretion in the legislature to restrict and limit this power of the corporations, and to define it ; to declare how much money the cities may borrow, how much debt they may create, how much money they may levy by taxation and for assessments. And the last clause—

" So as to prevent abuses in assessments and in contracting debts by such municipal corporations."

How prevent *abuses* in these particulars, if the section itself contains a *prohibition,* both upon the legislature and municipal corporations ?

The whole section implies a discretion in the corporations mentioned in it, without restriction, and imposes a duty upon

the legislature " to limit, regulate and control that discretion."
The power is with the legislature. It is wisely left there to be
exercised in its discretion. It may *restrict*, and as it may *re-*
*strict* so it may *allow* the creation of city debts, and prescribe
their limits and conditions, as is done in this case.

Any other view of this section of the constitution appears to
us to be utterly untenable, or at least the view that it contains
an express restriction or limitation upon the powers of the legis-
lature to authorize the contracting of debts of municipal corpo-
rations, cannot be maintained. It may be, and doubtless is true,
that the members of the convention, or many of them who de-
vised the present constitution, desired to restrict more strin-
gently the powers of municipal corporations on the subject of
contracting city debts, and considered that they needed such
restraint as the learned judge suggests; but we can look at no
undefined purpose not embodied in the instrument.

We are called upon to interpret the provisions clearly ex-
pressed in the constitution itself. We cannot go beyond the
written word—if it be clear and explicit in its terms. The
constitution speaks for itself. It is in and of itself the will of
the people. We can look only to the language not doubtful,
inexplicit or ambiguous. It clearly contains no express pro-
vision that forbids the legislature from passing the act to amend
the charter of the city of Rochester under consideration, or any
of the sections in controversy.

In conclusion, we think the following propositions may be
safely affirmed to be the law upon the whole case :—

*First.* That all the inherent powers of the people for self-
government, not delegated to the general government, is re-
served, and belongs to the state.

*Second.* That of such reserved powers, the entire legislative
power is vested in the state legislature, subject to no restric-
tions or limitations, except such as are contained in the state
constitution.

*Third.* That the taxing power belongs to the legislature, and
is subject to no limits or restrictions, outside of the United
States and state constitutions.

*Fourth.* That the power to authorize the construction of works of internal improvement, and to provide for their construction by the officers or agents of the state rests with, and pertains to the legislature, to be exercised within its ·exclusive discretion.

*Fifth.* That such works may be constructed by general taxation, and, in case of local works, by local taxation; or the state may aid in their construction by becoming a stockholder in private corporations; or authorize municipal corporations to become such stockholders for such purpose.

*Sixth.* That railroads are public works, and may be constructed by the state or by corporations, and lands taken for their use are taken for the *public use,* and may be so taken on payment of a just compensation.

*Seventh.* That the legislature is the exclusive judge in respect to what works are for the public benefit, and in regard to the expediency of constructing such works, and as to the mode of their construction, whether by the state or by private or municipal corporations in whole or in part.

*Eighth.* That the legislature may authorize municipal corporations to subscribe to the stock of a railroad company, with the consent and approval of a majority of the corporators duly ascertained.

*Ninth.* That the passage of a law authorizing such subscriptions to the stock of a private corporation, subject to the assent or approval of the corporation, or to take effect upon the approval or assent of a municipal corporation, by the vote of the corporators, is not a delegation of power to the corporation to pass a law, but is a legitimate case of conditional legislation, and is entirely within the discretion of the legislature.

*Tenth.* That the act to amend the charter of the city of Rochester, passed July 5th, 1851, including the §§ 285 to 291, inclusive, was a valid law immediately upon its passage and the signature of the governor thereto ; and that the provision therein, that those sections should not take effect until approved by the corporation, merely suspended the power of the common council to act upon said sections until such approval.

Clarke agt. The City of Rochester.

*Eleventh.* Finally: The acts of the city of Rochester, in sub-scribing for the stock of the Genesee Valley Railroad Company, and in issuing the bonds of the city to pay for such stock, as stated in the case in this action, were legal and valid acts; and the city was entitled to take and hold such stock, or to sell it to the plaintiff as valid stock, and is bound to pay the bonds so issued; and the plaintiff was not entitled to rescind his contract for the purchase of such stock on the ground of its invalidity.

The judgment of the special term was, therefore, erroneous, and should be reversed and a new trial granted, with costs to abide the event.

Judgment reversed, and new trial granted.

Judge WELLES did not hear the argument, but was present at Auburn when the case came up for decision, and had previously examined the case, the points of counsel and the foregoing opinion, in which he entirely concurred.

Judge STRONG concurs in a separate opinion.

Judge JOHNSON, in a separate opinion, *dissents* upon a single point, in respect to the case of *Barto* agt. *Himrod.*

T. R. STRONG, Justice.   The foundation of this action is the alleged invalidity of the provisions of the act of the legislature relating to the city of Rochester, passed July 5, 1851, which purport to authorize the common council of the city to borrow money on the faith and credit of the city, and issue bonds therefor, and invest the same in the stock of the Genesee Valley Railroad Company.   If those provisions are invalid, the bonds issued by the common council and the subscriptions for stock in pursuance thereof were nullities; the agreement for the purchase of the stock and bonds by the plaintiff is without consideration and void; and the plaintiff is entitled to recover back what he has paid under that agreement.

One ground on which the invalidity of those provisions is

Clarke agt. The City of Rochester.

asserted is, that it was not within the scope of the legislative power of the state, independent of any restrictions in the constitution upon that power, to invest a municipal corporation with authority to burden the property of the citizens of the locality which it embraces, by becoming stockholders in a private corporation.

It is not denied but that the state may provide by law for the construction of a railroad through the agency of its own officers, taking all lands necessary for the purpose by virtue of its right of eminent domain; or delegate the power to build the road, and take the lands required for it, to a private corporation. Nor is it disputed that the state may, under its taxing power, charge the expense of such a public improvement, made by itself, upon the citizens of a particular locality, which may be supposed to be more immediately benefited by the improvement; nor is it controverted that a municipal corporation may be authorized by law to make such public improvements as are required by the interests of its locality, and tax the citizens of the locality to defray the expense. The power of the state to this extent is unquestioned, and so well established by long exercise of it, and by judicial decisions, as to render a discussion of it unnecessary, if not unprofitable. But the precise point presented is, that a subscription for stock in a railroad corporation is like an investment in the stock of a manufacturing company, or in the mercantile, or any similar private business, of a mere private nature—foreign to the office or business of government—and therefore without the limits of the sovereign power; and that the state, not possessing the power itself, cannot confer it on a municipal corporation.

It is a question upon which there is some conflict of opinion, whether there is such a limitation of legislative power as that suggested, to matters of a public nature and incident to government; and while it would seem to be proper that the power should be thus confined, there certainly would be great difficulty in maintaining, if it would not be impossible to maintain, the limitation in practice, without conceding to and claiming for the judicial department the paramount jurisdiction to deter-

Clarke agt. The City of Rochester.

mine what is and what is not public and connected with government. This jurisdiction is legislative in its nature, and there is great force in the argument, that it is indispensable to the just weight and beneficial action of the legislative department that it should exclusively belong to that branch of the government. If the limitation exists, it must be applicable to cases clearly, palpably, and without question, wholly private, and in no way relating to government. If the sole right of decision on this subject is vested in the legislature, the legislative power, beyond the restrictions of the constitution, is unlimited.

It is not my purpose to discuss this question, or to express any opinion upon it, as it is entirely unnecessary, in the view I take of the position under consideration.

That position, in my judgment, is fatally erroneous, in regarding and treating the subject of the provisions in question as a private business belonging to the same class as the business of banking, and of manufacturing and commercial associations, incorporated or unincorporated. Those provisions upon their face clearly show that the leading object of them was to enable the city to afford aid to, and thereby secure the construction of the Genesee Valley Railroad. A company had been formed under the authority of the state for building the road, to which the state had delegated all necessary power for the purpose. It was an enterprise of a public nature, committed by the state to a private company, invested by the state for the purpose of the road, with a large portion of its sovereign power. The company were authorized to take lands for the road under the right of the state of eminent domain, or to take private property for the public use upon making just compensation. Upon the assumption that the public good required the road should be built only, could this authority be conferred.

The road was to be in part in the city, and was to traverse one of the most fertile and richest portions of the state, inhabited by a numerous and wealthy population. It was supposed, and not without reason, that the road, if completed, would contribute largely to the business and wealth of the city, and ben-

efit it beyond other portions of the state, and therefore it should aid in the work. Hence the legislature was appealed to for authority to render such aid, and the provisions in question were enacted. Not only is it apparent on the face of the provisions, it is also manifest from the public history of the road, of which the court may properly take notice, that such was the motive and design of the legislature. The work was of a public nature and for the public benefit, and authority was given to the city to aid it for the good of the public, and more especially of the city.

Clearly the state might have built the road: no good reason is perceived why it might not have authorized the city to build it; and if it was competent for the state, in view of the public good, to confer such authority, why might not the state, influenced by the same motive, give authority to the city to aid a railroad company in the work. The state might doubtless have built the road, and assessed the city beyond the rest of the state to pay the expense, and why not authorize the city voluntarily to assume a burden in aid of a private company, substituted for the state in respect to the work, which the state might have imposed, if the state had taken upon itself the enterprise.

The fact that the principal part of the road is out of the limits of the city, cannot affect the question of the public nature and benefit of the work, and the power of the state to grant the authority it has assumed to give. A municipal corporation may be authorized to do an act without as well as within its local limits of a public character, and relating to its government, such as building an aqueduct for conveying water into a city, or a road or canal, in the vicinity of and connected with its locality.

Assuming the construction of the road to be a work of a public character, which the city might be authorized to do, it seems to be clear that it might equally be authorized to assist others in doing the work.

The power of the legislature over the subject being established, the expediency or propriety of its exercise in any case

cannot be reviewed by the courts. Undoubtedly the power has been, and will be abused, but the only remedy under our system is in displacing, at the earliest opportunity, all legislators who are unfaithful or incompetent, and bestowing greater care in the selection of such officers.

Another ground, on which the provisions in question are claimed to be invalid, is, that they are, as alleged, in conflict with the constitution. Most, if not all of the strength of the argument, to sustain this point in the case, rests upon the idea, already attempted to be refuted, that the authority sought to be conferred by them, and the object of it, are of a private and not public nature. Viewing them in a light directly the reverse, they are readily seen to be harmonious with every part of the constitution. They are provisions made in the exercise of the general power of the legislature to authorize municipal corporations to do such public acts as are required by the public good in reference to their own territorial limits—the same power to which must be referred the grant of authority to such corporations to lay out and open streets, and keep them in repair, and to make other similar local public improvements incident to and proper for the good government of the community.

This power is clear and undisputable, and it is distinctly conceded in the opinion in this case of the learned justice at special term. He says, in reference to the city, the legislature "might cause all necessary streets to be laid out, opened and worked, and all local improvements to be made, and do whatever else, within the locality, they should deem proper for the good government of the community, and assess the expenses, as a part of the public burden, upon the community for whose benefit the expense should be incurred, or such part of the community as they should think right by reason of the particular benefits to be charged; and this power may be delegated to the common council of the city for the locality embraced within its boundaries." Obviously, as already stated, it is not indispensable that the improvements should be wholly within the city, for, although as a general rule, the powers of a city are to be exercised within its locality, the legislature may author-

ize improvements without that locality for the benefit of the city. Its power to do this is as ample as its power to create the city originally, and prescribe its limits and authority.

The 9th section of article 8 of the constitution, imposing upon the legislature the duty to provide for the organizations of cities and villages, and to restrict the power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and contracting debts, by such corporations, is particularly relied on as prohibiting the legislation under consideration.

The design of this section, so far as it makes it a duty of the legislature to restrict the power of taxation, &c., of cities and villages, was, in my judgment, to guard, by proper limitations, against abuse in contracting debts in the exercise of the powers granted to them by the legislature, not to limit the legislature in granting power to such corporations. If the latter had been the object, some attempt would have been made to specify and define the powers which might be granted? The subject would not have been left without specification and definition. What power may be granted? Where does the line of prohibition commence? The sections contain no answer to these questions. They are silent as to the powers which may be granted. The legislature may grant such powers as itself possesses, but must provide against the abuse of these powers, so far as relates to contracting debts, assessments and taxation.

A further objection to the validity of the legislation in question is, that the legislature had no power, under the constitution, to delegate to the electors of the city the decision of the question, whether the provisions should become a law; that in respect to the expediency of the law, the legislature was made by the constitution the sole and exclusive judge.

In *Barto* agt. *Himrod*, (4 *Seld.* 483,) it was decided, by the court of appeals, that the act known as the "Free-School Act," which contained provisions submitting it to the electors of the state to determine whether the act should become a law, and making the fact of its becoming a law dependent upon approval by the people, although approved by them, was void for want

of constitutional power in the legislature to commit to the people the decision whether the act should become a law. That case is relied on in support of the objection; and it is assumed that the present case, as to the point raised, is substantially like it, and if it is, it must share the same fate. I have had some difficulty in coming to a satisfactory conclusion on the point, whether this case is within the principle of that cited; but after much and careful consideration, am convinced that a substantial distinction, requiring the application of different rules of decision, exists between the cases. Such a distinction does not, I believe, arise from the circumstance that in the free-school law the language was, that the electors of the state should determine whether this act " shall or shall not become a law," and in case a majority should be against it, the act " shall be null and void," and that in the case of the present legislation the language is, that the sections " shall not take effect" until they should be submitted to the electors of the city, and upon the event therein mentioned. Those expressions differ only in form—they import the same idea in substance.

An act does not become a law—a rule of action for the community, or any company, or individuals—until it takes effect, and when it takes effect it is a law. There is no such thing as a law *in presenti* to take effect *in futuro*. An act to take effect in future, at a fixed time, or upon any certain event, must await the time, or other event, to become a law; and especially is this true where the event upon which the act is to take effect is contingent, like a popular vote of approval. The true distinction as I conceive, arises out of the difference in the nature of the subjects of these acts, and in the questions submitted to the decision of the people.

The free-school act was of a mandatory character, and imposed duties and obligations on the people which they would be bound to perform, if the act should become a law by their approval, entirely irrespective of their will; and the question submitted to the people was, whether the act should become a law. Thus, as was held by the court of appeals, involving the

whole subject of the propriety and expediency of the law, as well as of the strict enforcement of the various provisions, and attempting, by the legislature, to cast off the responsibility imposed upon it in the making of laws, and placing it with a majority of the people, which could not be done under the constitution.

The provisions under consideration are merely permissive; they purport only to grant an authority, which the common council, if the act should become a law, would not be bound to exercise ; and the question submitted to the people of the city was, by the terms of the provisions, " whether or not it is expedient for said city to borrow the money mentioned in said sections, for the purpose therein specified." It was not referred to the people to decide whether the authority should be granted ; that the legislature had determined, if two-thirds of the electors were in favor of its being exercised.   The legislature gave the authority conditioned upon a popular vote in favor of borrowing the money.   The form of the vote was to be, "for the railroad " and " against the railroad," and a vote of two-thirds for the road was to decide that it was expedient to borrow the money, while a vote exceeding one-third the other way, was to be a decision that it was inexpedient.

It is true, that a decision in favor of the expediency of borrowing the money was to be deemed an approval of the law, as, by § 292, it is declared that if the previous sections shall be approved, &c., the same shall take effect, &c., but the approval was to be implied from a vote for borrowing the money ; it was not the question submitted for decision.   Nothing like power to make the law was to be vested in the people.   The legislature made the law dependent only on the event of the people wanting to use the authority.   The ground of objection to the free-school act seems, therefore, to be wholly inapplicable to this legislation ; and, if inapplicable, the decision referred to is no authority against it.

Again : It is conceded in the opinion in this case, at special term, and supported by the reasoning of the learned judges who

delivered opinions in *Barto* agt. *Himrod*, that a legislative grant of power to a municipal corporation, with a restriction upon its exercise, without the consent of the people to be affected by it, would be valid ; and this is substantially a law of that character. There is no difference in practical or legal effect between an act conferring power to borrow money upon the event of the people deciding, in a mode provided by the act, that it is expedient to borrow, and an act vesting the power absolutely, but prohibiting its exercise, unless the people shall decide it is expedient. In neither case do the people decide, except impliedly and by inference, upon the expediency of the law.

I perceive no objection, arising out of the constitution, to making a mere permissive law depend upon a vote of those designed to be benefited by the permission, in favor of the expediency of doing the act permitted. The whole legislative power is exerted, and the whole responsibility in regard to the law exercised by the legislature in such a case, no part of it is referred to others.

In the opinions in *Barto* agt. *Himrod*, it is admitted that conditional legislation, where there is no transfer of the legislative power or judgment, is allowable ; and RUGGLES, J., in his opinion, defines such allowable conditional legislation. He says, " The event or change of circumstances on which a law may be made to take effect, must be such as in the judgment of the legislature affects the question of the expediency of the law—an event on which the expediency of the law in the judgment of the law makers, depends. On this question of expepediency the legislature must exercise its own judgment definitively and finally. When a law is made to take effect on the happening of such an event, the legislature, in effect, declares the law inexpedient if the event should not happen; but expedient if it should happen. They appeal to no other men, or man, to judge for them in relation to its present or future expediency. They exercised that power themselves, and then perform the duty which the constitution imposes on them." These remarks accurately describe the law in question.

The other objections taken to the validity of the law are, in my opinion, untenable.

My conclusion is, that the judgment at special term is erroneous, and should be reversed.